GRUPO DATAFLUX *v.* ATLAS GLOBAL GROUP, L. P., ET AL.

No. 02–1689.   Argued March 3, 2004—Decided May 17, 2004

*William J. Boyce* argued the cause for petitioner. With him on the briefs were *Warren S. Huang* and *Mark A. Robertson.*

*Roger B. Greenberg* argued the cause for respondents. With him on the brief was *Gerardo Garcia.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a party's post-filing change in citizenship can cure a lack of subject-matter jurisdiction that existed at the time of filing in an action premised upon diversity of citizenship. See 28 U. S. C. § 1332.

I

Respondent Atlas Global Group, L. P., is a limited partnership created under Texas law. In November 1997, Atlas filed a state-law suit against petitioner Grupo Dataflux, a Mexican corporation, in the United States District Court for the Southern District of Texas. The complaint contained claims for breach of contract and *in quantum meruit*, seeking over $1.3 million in damages. It alleged that "[f]ederal jurisdiction is proper based upon diversity jurisdiction pursuant to 28 U. S. C. § 1332(a), as this suit is between a Texas citizen [Atlas] and a citizen or subject of Mexico [Grupo Da-

taflux]."[1]  App. 19a (Complaint ¶ 3).  Pretrial motions and discovery consumed almost three years.  In October 2000, the parties consented to a jury trial presided over by a Magistrate Judge.  On October 27, after a 6-day trial, the jury returned a verdict in favor of Atlas awarding $750,000 in damages.

On November 18, before entry of the judgment, Dataflux filed a motion to dismiss for lack of subject-matter jurisdiction because the parties were not diverse at the time the complaint was filed.  See Fed. Rules Civ. Proc. 12(b)(1), (h)(3).  The Magistrate Judge granted the motion.  The dismissal was based upon the accepted rule that, as a partnership, Atlas is a citizen of each State or foreign country of which any of its partners is a citizen.  See *Carden* v. *Arkoma Associates*, 494 U. S. 185, 192–195 (1990).  Because Atlas had two partners who were Mexican citizens at the time of filing, the partnership was a Mexican citizen.  (It was also a citizen of Delaware and Texas based on the citizenship of its other partners.)  And because the defendant, Dataflux, was a Mexican corporation, aliens were on both sides of the case, and the requisite diversity was therefore absent.  See *Mossman* v. *Higginson*, 4 Dall. 12, 14 (1800).

On appeal, Atlas did not dispute the finding of no diversity at the time of filing.  It urged the Court of Appeals to disregard this failure and reverse dismissal because the Mexican partners had left the partnership in a transaction consummated the month before trial began.  Atlas argued that, since diversity existed when the jury rendered its verdict, dismissal was inappropriate.  The Fifth Circuit agreed.  312 F. 3d 168, 174 (2002).  It acknowledged the general rule that, for purposes of determining the existence of diversity

---

[1] Title 28 U. S. C. § 1332(a)(2) provides:

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between . . .

"citizens of a State and citizens or subjects of a foreign state."

jurisdiction, the citizenship of the parties is to be determined with reference to the facts as they existed at the time of filing. *Id.*, at 170. However, relying on our decision in *Caterpillar Inc.* v. *Lewis*, 519 U. S. 61 (1996), it held that the conclusiveness of citizenship at the time of filing was subject to exception when the following conditions are satisfied:

> "(1) [A]n action is filed or removed when constitutional and/or statutory jurisdictional requirements are not met, (2) neither the parties nor the judge raise the error until after a jury verdict has been rendered, or a dispositive ruling has been made by the court, and (3) before the verdict is rendered, or ruling is issued, the jurisdictional defect is cured." 312 F. 3d, at 174.

The opinion strictly limited the exception as follows: "If at any point prior to the verdict or ruling, the issue is raised, the court must apply the general rule and dismiss regardless of subsequent changes in citizenship." *Ibid.*

The jurisdictional error in the present case not having been identified until after the jury returned its verdict; and the postfiling change in the composition of the partnership having (in the Court's view) cured the jurisdictional defect; the Court reversed and remanded with instructions to the District Court to enter judgment in favor of Atlas. *Ibid.* We granted certiorari. 540 U. S. 944 (2003).

## II

It has long been the case that "the jurisdiction of the court depends upon the state of things at the time of the action brought." *Mollan* v. *Torrance*, 9 Wheat. 537, 539 (1824). This time-of-filing rule is hornbook law (quite literally[2])

---

[2] See, *e. g.*, J. Friedenthal, M. Kane, & A. Miller, Civil Procedure 27 (3d ed. 1999); C. Wright & M. Kane, Law of Federal Courts 173 (6th ed. 2002). See also 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3608, p. 452 (1984).

taught to first-year law students in any basic course on federal civil procedure. It measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing—whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal. (Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment. See *Capron* v. *Van Noorden*, 2 Cranch 126 (1804).)

We have adhered to the time-of-filing rule regardless of the costs it imposes. For example, in *Anderson* v. *Watt*, 138 U. S. 694 (1891), two executors of an estate, claiming to be New York citizens, had brought a diversity-based suit in federal court against defendants alleged to be Florida citizens. When it later developed that two of the defendants were New York citizens, the plaintiffs sought to save jurisdiction by revoking the letters testamentary for one executor and alleging that the remaining executor was in fact a British citizen. The Court rejected this attempted postfiling salvage operation, because at the time of filing the executors included a New Yorker. *Id.*, at 708. It dismissed the case for want of jurisdiction, even though the case had been filed about 5½ years earlier, the trial court had entered a decree ordering land to be sold 4 years earlier, the sale had been made, exceptions had been filed and overruled, and the case had come to the Court on appeal from the order confirming the land sale. *Id.*, at 698. Writing for the Court, Chief Justice Fuller adhered to the principle set forth in *Conolly* v. *Taylor*, 2 Pet. 556, 565 (1829), that "jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." "[J]urisdiction," he reasoned, "could no more be given . . . by the amendment than if a citizen of Florida had sued another in

that court and subsequently sought to give it jurisdiction by removing from the State." 138 U. S., at 708.[3]

It is uncontested that application of the time-of-filing rule to this case would require dismissal, but Atlas contends that this Court "should accept the very limited exception created by the Fifth Circuit to the time-of-filing principle." Brief for Respondents 2. The Fifth Circuit and Atlas rely on our statement in *Caterpillar, supra*, at 75, that "[o]nce a diversity case has been tried in federal court . . . considerations of finality, efficiency, and economy become overwhelming." This statement unquestionably provided the *ratio decidendi* in *Caterpillar*, but it did not augur a new approach to deciding whether a jurisdictional defect has been cured.

*Caterpillar* broke no new ground, because the jurisdictional defect it addressed had been cured by the dismissal of the party that had destroyed diversity. That method of curing a jurisdictional defect had long been an exception to the time-of-filing rule. "[T]he question always is, or should be, when objection is taken to the jurisdiction of the court by reason of the citizenship of some of the parties, whether . . . they are indispensable parties, for if their interests are severable and a decree without prejudice to their rights may be made, the jurisdiction of the court should be retained and the suit dismissed as to them." *Horn* v. *Lockhart*, 17 Wall. 570, 579 (1873). Federal Rule of Civil Procedure 21 provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." By now, "it is

---

[3] The dissent asserts that *Anderson* is "not altogether in tune with *Caterpillar* and *Newman-Green*," *post*, at 591, n. 7 (opinion of GINSBURG, J.), but the cases can easily be harmonized. *Anderson* did not, as the dissent suggests, refuse to give diversity-perfecting effect to the dismissal of an independent severable party; it refused to give that effect to the alteration of a coexecutorship into a lone executorship—much as we decline to give diversity-perfecting effect to the alteration of a partnership with diversity-destroying partners into a partnership without diversity-destroying partners.

well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." *Newman-Green, Inc.* v. *Alfonzo-Larrain,* 490 U. S. 826, 832 (1989). Indeed, the Court held in *Newman-Green* that courts of appeals also have the authority to cure a jurisdictional defect by dismissing a dispensable nondiverse party. *Id.,* at 837.

*Caterpillar* involved an unremarkable application of this established exception. Complete diversity had been lacking at the time of removal to federal court, because one of the plaintiffs shared Kentucky citizenship with one of the defendants. Almost three years after the District Court denied a motion to remand, but before trial, the diversity-destroying defendant settled out of the case and was dismissed. The case proceeded to a 6-day jury trial, resulting in judgment for the defendant, Caterpillar, against Lewis. This Court unanimously held that the lack of complete diversity at the time of removal did not require dismissal of the case.

The sum of *Caterpillar*'s jurisdictional analysis was an approving acknowledgment of Lewis's admission that there was "complete diversity, and therefore federal subject-matter jurisdiction, at the time of trial and judgment." 519 U. S., at 73. The failure to explain *why* this solved the problem was not an oversight, because there was nothing novel to explain. The postsettlement dismissal of the diversity-destroying defendant cured the jurisdictional defect just as the dismissal of the diversity-destroying party had done in *Newman-Green.* In both cases, the less-than-complete diversity which had subsisted throughout the action had been converted to complete diversity between the remaining parties to the final judgment. See also *Horn, supra,* at 579.

While recognizing that *Caterpillar* is "technically" distinguishable because the defect was cured by the dismissal of a diversity-destroying party, the Fifth Circuit reasoned that

"this factor was not at the heart of the Supreme Court's analysis . . . ." 312 F. 3d, at 172–173. The crux of the analysis, according to the Fifth Circuit, was *Caterpillar's* statement that "[o]nce a diversity case has been tried in federal court . . . considerations of finality, efficiency, and economy become overwhelming." 519 U. S., at 75. This was indeed the crux of analysis in *Caterpillar*, but analysis of a different issue. It related not to cure of the *jurisdictional* defect, but to cure of a *statutory* defect, namely, failure to comply with the requirement of the removal statute, 28 U. S. C. § 1441(a), that there be complete diversity at the time of removal.[4] The argument to which the statement was directed took as its *starting point* that subject-matter jurisdiction had been satisfied: "ultimate satisfaction of the subject-matter jurisdiction requirement ought not swallow up antecedent *statutory* violations." 519 U. S., at 74 (emphasis added). The resulting holding of *Caterpillar*, therefore, is only that a statutory defect—"Caterpillar's failure to meet the § 1441(a) requirement that the case be fit for federal adjudication at the time the removal petition is filed," *id.*, at 73—did not require dismissal once there was no longer any jurisdictional defect.

### III

To our knowledge, the Court has never approved a deviation from the rule articulated by Chief Justice Marshall in 1829 that "[w]here there is *no* change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." *Conolly*, 2 Pet., at 565 (emphasis added). Unless the Court is to manufacture a brand-new exception to the time-of-filing rule,

---

[4] Title 28 U. S. C. § 1441(a) provides, in relevant part:

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

dismissal for lack of subject-matter jurisdiction is the only option available in this case. The purported cure arose not from a change in the parties to the action, but from a change in the citizenship of a continuing party. Withdrawal of the Mexican partners from Atlas did not change the fact that Atlas, the single artificial entity created under Texas law, remained a party to the action. True, the composition of the partnership, and consequently its citizenship, changed. But allowing a citizenship change to cure the jurisdictional defect that existed at the time of filing would contravene the principle articulated by Chief Justice Marshall in *Conolly*.[5] We decline to do today what the Court has refused to do for the past 175 years.

Apart from breaking with our longstanding precedent, holding that "finality, efficiency, and judicial economy" can justify suspension of the time-of-filing rule would create an exception of indeterminate scope. The Court of Appeals sought to cabin the exception with the statement that "[i]f at any point prior to the verdict or ruling, the [absence of diversity at the time of filing] is raised, the court must apply the general rule and dismiss regardless of subsequent

---

[5] The dissent acknowledges that "[t]he Court has long applied [Chief Justice] Marshall's time-of-filing rule categorically to postfiling changes that otherwise would *destroy* diversity jurisdiction," *post*, at 583–584, but asserts that "[i]n contrast, the Court has not adhered to a similarly steady rule for postfiling changes in the party lineup, alterations that *perfect* previously defective statutory subject-matter jurisdiction," *post*, at 584. The authorities relied upon by the dissent do not call into question the particular aspect of the time-of-filing rule that is at issue in this case— the principle (quoted in text) that "[w]here there is *no* change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." *Conolly*, 2 Pet., at 565 (emphasis added). The dissent identifies five cases in which the Court permitted a postfiling change to cure a jurisdictional defect. *Post*, at 584. Every one of them involved a *change of party*. The dissent does not identify a single case in which the Court held that a single party's postfiling change of citizenship cured a previously existing jurisdictional defect.

changes in citizenship." 312 F. 3d, at 174. This limitation is unsound in principle and certain to be ignored in practice.

It is unsound in principle because there is no basis in reason or logic to dismiss preverdict if in fact the change in citizenship has eliminated the jurisdictional defect. Either the court has jurisdiction at the time the defect is identified (because the parties are diverse at that time) or it does not (because the postfiling citizenship change is irrelevant). If the former, then dismissal is inappropriate; if the latter, then retention of jurisdiction postverdict is inappropriate.

Only two escapes from this dilemma come to mind, neither of which is satisfactory. First, one might say that it is not *any* change in party citizenship that cures the jurisdictional defect, but only a change that remains unnoticed until the end of trial. That is not so much a logical explanation as a restatement of the illogic that produces the dilemma. There is no conceivable reason why the jurisdictional deficiency which continues despite the citizenship change should suddenly disappear upon the rendering of a verdict. Second, one might say that there never was a cure, but that the party who failed to object before the end of trial forfeited his objection. This is logical enough, but comes up against the established principle, reaffirmed earlier this Term, that "a court's subject-matter jurisdiction cannot be expanded to account for the parties' litigation conduct." *Kontrick* v. *Ryan*, 540 U. S. 443, 456 (2004). "A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." *Id.*, at 455. Because the Fifth Circuit's attempted limitation upon its new exception makes a casualty either of logic or of this Court's jurisprudence, there is no principled way to defend it.

And principled or not, the Fifth Circuit's artificial limitation is sure to be discarded in practice. Only 8% of diversity cases concluded in 2003 actually went to trial, and the median time from filing to trial disposition was nearly two years.

See Administrative Office of the United States Courts, Statistics on Diversity Filings and Terminations in District Courts for Calendar Year 2003 (on file with the Clerk of Court). In such a litigation environment, an approach to jurisdiction that focuses on efficiency and judicial economy cannot possibly be held to the line drawn by the Court of Appeals. As Judge Garza observed in his dissent:

> "[T]here is no difference in efficiency terms between the jury verdict and, for example, the moment at which the jury retires. Nor, for that matter, is there a large difference between the verdict and mid-way through the trial. . . . Indeed, in complicated cases requiring a great deal of discovery, the parties and the court often expend tremendous resources long before the case goes to trial." 312 F. 3d, at 177.

### IV

The dissenting opinion rests on two principal propositions: (1) the jurisdictional defect in this case was cured by a change in the composition of the partnership; and (2) refusing to recognize an exception to the time-of-filing rule in this case wastes judicial resources, while creating an exception does not. We discuss each in turn.

### A

Unlike the dissent, our opinion does not turn on whether the jurisdictional defect here contained at least "minimal diversity."[6] Regardless of how one characterizes the ac-

---

[6] The answer to the "minimal diversity" question is not as straightforward as the dissent's analysis suggests. We understand "minimal diversity" to mean the existence of at least *one* party who is diverse in citizenship from one party on the other side of the case, even though the extraconstitutional "complete diversity" required by our cases is lacking. It is possible, though far from clear, that one can have opposing parties in a two-party case who are cocitizens, and yet have minimal Article III jurisdiction because of the multiple citizenship of one of the parties. Although the Court has previously said that minimal diversity requires "two

knowledged jurisdictional defect, it was never cured. The only two ways in which one could conclude that it had been cured would be either (1) to acknowledge that a party's post-filing change of citizenship *can* cure a time-of-filing jurisdictional defect, or (2) to treat a change in the composition of a partnership like a change in the parties to the action. The Court has never, to our knowledge, done the former; and not even the dissent suggests that it ought to do so in this case.[7] The dissent diverges from our analysis by adopting the latter approach, stating that "this case seems . . . indistinguishable from one in which there is a change in the parties to the action." *Post*, at 591 (internal quotation marks omitted).

This equation of a dropped partner with a dropped party is flatly inconsistent with *Carden*. The dissent in *Carden* sought to apply a "real party to the controversy" approach to determine which partners counted for purposes of jurisdictional analysis. The *Carden* majority rejected that ap-

---

adverse parties [who] are not co-citizens," *State Farm Fire & Casualty Co.* v. *Tashire*, 386 U. S. 523, 531 (1967), the Court did not have before it a multiple-citizenship situation.

The dissent contends that the existence of minimal diversity was clear because the rule of *Carden* v. *Arkoma Associates*, 494 U. S. 185 (1990), is not required by the Constitution. *Post*, at 588–590. But neither is the rule that a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U. S. C. § 1332(c)(1). We do not understand the inquiry into minimal diversity to proceed by hypothetically rewriting, to whatever the Constitution might allow that would support Article III jurisdiction in the particular case, all laws bearing upon the diversity question. Whether the Constitution requires it or not, *Carden is* the subconstitutional rule by which we determine the citizenship of a partnership—and in this case it leads to the conclusion that there were *no* opposing parties who were not cocitizens.

[7] The dissent appears to leave open the possibility that this line could be crossed in a future case, contrasting *Caterpillar Inc.* v. *Lewis*, 519 U. S. 61 (1996), not with all cases involving a party's change of citizenship, but with the polar extreme of "a plaintiff who moves to another State to create diversity not even minimally present when the complaint was filed," *post*, at 590.

proach, reasoning that "[t]he question presented today is not which of various parties before the Court should be considered for purposes of determining whether there is complete diversity of citizenship . . . . There are *not* . . . multiple respondents before the Court, but only *one:* the artificial entity called Arkoma Associates, a limited partnership." 494 U. S., at 188, n. 1. Today's dissent counters that "[w]hile a partnership may be characterized as a single artificial entity, a district court determining whether diversity jurisdiction exists looks to the citizenship of the several persons composing [the entity]." *Post,* at 591, n. 8 (internal quotation marks and citations omitted). It is true that the court "looks to" the citizenship of the several persons composing the entity, but it does so for the purpose of determining the citizenship of the entity that is a party, not to determine which citizens who compose the entity are to be treated as parties. See *Carden,* 494 U. S., at 188, n. 1 ("[W]hat we must decide is the . . . question of how the citizenship of that single artificial entity is to be determined"); *id.,* at 195 ("[W]e reject the contention that to determine, for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all of the entity's members").[8]

There was from the beginning of this action a single plaintiff (Atlas), which, under *Carden,* was not diverse from the sole defendant (Dataflux). Thus, this case fails to present "two adverse parties [who] are not co-citizens." *State Farm Fire & Casualty Co.* v. *Tashire,* 386 U. S. 523, 531 (1967). Contrary to the dissent's characterization, then, this is not a

---

[8] These statements from *Carden* rebut the dissent's assertion that "an association whose citizenship, for diversity purposes, is determined by aggregating the citizenships of each of its members" could "[w]ith equal plausibility . . . be characterized as an 'aggregation' composed of its members, or an 'entity' comprising its members." *Post,* at 590, n. 6. We think it evident that *Carden* decisively adopted an understanding of the limited partnership as an "entity," rather than an "aggregation," for purposes of diversity jurisdiction. See 494 U. S., at 188, n. 1.

case like *Caterpillar* or *Newman-Green* in which "party lineup changes . . . simply trimmed the litigation down to an ever-present core that met the statutory requirement." *Post*, at 591. Rather, this is a case in which a single party changed its citizenship by changing its internal composition.

The incompatibility with prior law of the dissent's attempt to treat a change in partners like a change in parties is revealed by a curious anomaly: It would produce a case unlike every other case in which dropping a party has cured a jurisdictional defect, in that no judicial action (such as granting a motion to dismiss) was necessary to get the jurisdictional spoilers out of the case. Indeed, judicial action to that end was not even *possible:* The court could hardly have "dismissed" the partners from the partnership to save jurisdiction.[9]

## B

We now turn from consideration of the conceptual difficulties with the dissent's disposition to consideration of its practical consequences. The time-of-filing rule is what it is precisely because the facts determining jurisdiction are subject to change, and because constant litigation in response to that change would be wasteful. The dissent would have it that the time-of-filing rule applies to establish that a court has jurisdiction (and to protect that jurisdiction from later destruction), but does *not* apply to establish that a court lacks jurisdiction (and to prevent postfiling changes that perfect jurisdiction). *Post*, at 583–584. But whether destruction or perfection of jurisdiction is at issue, the policy goal

---

[9] An additional anomaly, under the particular facts of the present case, is that the two individual Mexican partners, whom the dissent treats *like parties* for purposes of enabling their withdrawal to perfect jurisdiction, were brought into the litigation personally by the court's granting of Dataflux's motion to add them as parties for purposes of Dataflux's counterclaim. The motion was made and granted under Federal Rule of Civil Procedure 13(h), which applies only to "[p]ersons *other than* those made parties to the original action." (Emphasis added.)

of minimizing litigation over jurisdiction is thwarted whenever a new exception to the time-of-filing rule is announced, arousing hopes of further new exceptions in the future. Cf. *Dretke* v. *Haley, ante,* at 394–395 (recognizing that the creation of exceptions to judge-made procedural rules will enmesh the federal courts in litigation testing the boundaries of each new exception). That litigation-fostering effect would be particularly strong for a new exception derived from such an expandable concept as the "efficiency" rationale relied upon by the dissent.

The dissent argues that it is essential to uphold jurisdiction in this and similar cases because dismissal followed by refiling condemns the parties to "an almost certain replay of the case, with, in all likelihood, the same ultimate outcome." *Post,* at 595. But if the parties expect "the same ultimate outcome," they will not waste time and resources slogging through a new trial. They will settle, with the jury's prior verdict supplying a range for the award. Indeed, settlement instead of retrial will probably occur even if the parties do *not* expect the same ultimate outcome. When the stakes remain the same and the players have been shown each other's cards, they will not likely play the hand all the way through just for the sake of the game. And finally, even if the parties run the case through complete "relitigation in the very same District Court in which it was first filed in 1997," *post,* at 598, the "waste" will not be great. Having been through three years of discovery and pretrial motions in the current case, the parties would most likely proceed promptly to trial.

Looked at in its overall effect, and not merely in its application to the sunk costs of the present case, it is the dissent's proposed rule that is wasteful. Absent uncertainty about jurisdiction (which the dissent's readiness to change settled law would preserve for the future), the obvious course, for a litigant whose suit was dismissed as Atlas's was, would have been immediately to file a new action. That is in fact what

Atlas did, though it later dismissed the new case without prejudice. Had that second suit been pursued instead of this one, there is little doubt that the dispute would have been resolved on the merits by now. Putting aside the time that has passed between the Fifth Circuit's decision and today, there were two years of wasted time between dismissal of the action and the Fifth Circuit's reversal of that dismissal—time that the parties could have spent litigating the merits (or engaging in serious settlement talks) instead of litigating jurisdiction.

Atlas and Dataflux have thus far litigated this case for more than 6½ years, including 3½ years over a conceded jurisdictional defect. Compared with the *one month* it took the Magistrate Judge to apply the time-of-filing rule and *Carden* when the jurisdictional problem was brought to her attention, this waste counsels strongly against any course that would impair the certainty of our jurisdictional rules and thereby encourage similar jurisdictional litigation.

\* \* \*

We decline to endorse a new exception to a time-of-filing rule that has a pedigree of almost two centuries. Uncertainty regarding the question of jurisdiction is particularly undesirable, and collateral litigation on the point particularly wasteful. The stability provided by our time-tested rule weighs heavily against the approval of any new deviation. The judgment of the Fifth Circuit is reversed.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

When this lawsuit was filed in the United States District Court for the Southern District of Texas in 1997, diversity of citizenship was incomplete among the adverse parties: The plaintiff partnership, Atlas Global Group (Atlas), had five members, including a general partner of Delaware citizenship and two limited partners of Mexican citizenship, App.

98a; the defendant, Grupo Dataflux (Dataflux), was a Mexican corporation with its principal place of business in Mexico, *id.,* at 18a. In a transaction completed in September 2000 unrelated to this lawsuit, all Mexican-citizen partners withdrew from Atlas. *Id.,* at 98a, 122a–123a. Thus, before trial commenced in October 2000, complete diversity existed. Only after the jury returned a verdict favorable to Atlas did Dataflux, by moving to dismiss the case, draw the initial jurisdictional flaw to the District Court's attention. The Court today holds that the initial flaw "still burden[s] and run[s] with the case," *Caterpillar Inc.* v. *Lewis,* 519 U. S. 61, 70 (1996); see *ante,* at 572–576; consequently, the entire trial and jury verdict must be nullified. In my view, the initial defect here—the original absence of complete diversity—"is not fatal to the ensuing adjudication." *Caterpillar,* 519 U. S., at 64. In accord with the Court of Appeals for the Fifth Circuit, I would leave intact the results of the six-day trial between completely diverse citizens, and would not expose Atlas and the courts to the "exorbitant cost" of relitigation, *id.,* at 77.

I

Chief Justice Marshall, in a pathmarking 1824 opinion, *Mollan* v. *Torrance,* 9 Wheat. 537, 539, instructed "that the jurisdiction of the court depends upon the state of things at the time of the action brought, and that, after vesting, it cannot be ousted by subsequent events." He did not extract this practical time-of-filing rule from any constitutional or statutory text. In contrast, 18 years earlier, Marshall had derived the complete-diversity rule from the text of the 1789 Judiciary Act, and so stated in *Strawbridge* v. *Curtiss,* 3 Cranch 267 (1806). Compare *State Farm Fire & Casualty Co.* v. *Tashire,* 386 U. S. 523, 530–531 (1967) (complete-diversity rule is statutory), with 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3608, p. 452 (2d ed. 1984) (time-of-filing rule "represents a policy decision").

The Court has long applied Marshall's time-of-filing rule categorically to postfiling changes that otherwise would *de-*

*stroy* diversity jurisdiction. See, *e. g., Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.,* 484 U. S. 49, 69 (1987) (SCALIA, J., concurring in part and concurring in judgment); *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.,* 303 U. S. 283, 289–290 (1938); *Mollan,* 9 Wheat., at 539–540. I do not question this consistently applied, altogether sensible refusal to allow a losing party, after summary judgment or an adverse verdict, to assert that all bets are off on the ground that jurisdiction, originally present, was thereafter divested.

In contrast, the Court has not adhered to a similarly steady rule for postfiling party lineup alterations that *perfect* previously defective statutory subject-matter jurisdiction. Compare *Keene Corp.* v. *United States,* 508 U. S. 200, 207–208 (1993) (dismissing suit); *Minneapolis & St. Louis R. Co.* v. *Peoria & Pekin Union R. Co.,* 270 U. S. 580, 586 (1926) (same); *Anderson* v. *Watt,* 138 U. S. 694, 707–708 (1891) (same), with *Caterpillar,* 519 U. S., at 64 (not dismissing suit); *Newman-Green, Inc.* v. *Alfonzo-Larrain,* 490 U. S. 826, 837–838 (1989) (same); *Mullaney* v. *Anderson,* 342 U. S. 415, 416–417 (1952) (same); *Horn* v. *Lockhart,* 17 Wall. 570, 579 (1873) (same); *Conolly* v. *Taylor,* 2 Pet. 556, 565 (1829) (same). Instead, the Court has recognized that "untimely compliance," *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach,* 523 U. S. 26, 43 (1998), with the complete-diversity rule announced in *Strawbridge* can operate to preserve an adjudication where (1) neither the parties nor the court raised the time-of-filing flaw until after resolution of the case by jury verdict or dispositive court ruling, and (2) prior to that resolution, the jurisdictional defect was cured. See *Caterpillar,* 519 U. S., at 64.

II

A

To state the background of this case in fuller detail, in November 1997, respondent Atlas, a limited partnership,

which then included two Mexican-citizen limited partners and a Delaware-citizen general partner,[1] commenced a federal-court action against Dataflux, a Mexican corporation with its principal place of business in Mexico. 312 F. 3d 168, 169–170 (CA5 2002); App. 18a–19a, 98a; Brief for Petitioner 3. Seeking recovery on contract and *quantum meruit* claims, Atlas erroneously asserted diversity jurisdiction under 28 U. S. C. § 1332(a). 312 F. 3d, at 169–170; App. 18a–19a.[2] Dataflux's answer admitted diversity jurisdiction even though, in fact, complete diversity did not exist given the altogether evident Mexican citizenship of both Dataflux and

---

[1] At the time of filing, Atlas comprised (1) general partner Bahia Management, L. L. C., a Texas limited liability company (LLC), which included Mexican-citizen members; (2) general partner Capital Financial Partner, Inc., a Delaware corporation; (3) limited partner HIL Financial Holdings, L. P., a limited partnership with Texas and Delaware citizenship; (4) limited partner Francisco Llamosa, a Mexican citizen; and (5) limited partner Oscar Robles, another Mexican citizen. Brief for Petitioner 3; App. 98a. At least arguably, the general partner Bahia Management, like the two limited partners of Mexican citizenship, initially spoiled diversity. Although the Court has never ruled on the issue, Courts of Appeals have held the citizenship of each member of an LLC counts for diversity purposes. See, *e. g., GMAC Commercial Credit LLC* v. *Dillard Dept. Stores,* 357 F. 3d 827, 829 (CA8 2004); *Cosgrove* v. *Bartolotta,* 150 F. 3d 729, 731 (CA7 1998). Bahia withdrew from Atlas at the same time as the two Mexican-citizen limited partners withdrew. App. 98a.

[2] Section 1332(a) provides:

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

"(1) citizens of different States;

"(2) citizens of a State and citizens or subjects of a foreign state;

"(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

"(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

"For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled."

two of Atlas' limited partners. 312 F. 3d, at 170; App. 35a; see *Carden* v. *Arkoma Associates,* 494 U. S. 185, 195–196 (1990) (federal court must look to citizenship of partnership's limited, as well as its general, partners to determine whether there is complete diversity). In addition, one of Atlas' general partners at least arguably ranked as a Mexican citizen. See *supra,* at 585, n. 1.

In September 2000, several weeks before trial, and unrelated to the claims in suit, Atlas completed a transaction in which all Mexican-citizen partners withdrew from the partnership. App. 14a, 122a–123a, 126a–128a; Brief for Appellants in No. 01–20245 (CA5), p. 7. After that reorganization, it is not disputed, complete diversity existed between the adverse parties. Brief for Petitioner 2; Brief for Respondents 2.

Prevailing at a six-day trial, Atlas gained a jury verdict of $750,000. 312 F. 3d, at 170. Dataflux then promptly moved to dismiss the action for lack of subject-matter jurisdiction, raising, for the first time, the original, but pretrial-cured, absence of complete diversity. App. 42a–49a. The District Court, which had not yet entered judgment on the jury's verdict, granted Dataflux's motion; simultaneously, the court "ordered that the statute of limitations for the claims alleged in this case [be] stayed from November 18, 1997, the date this case was filed, until ten days after the entry of this order [December 6, 2000], to allow plaintiff to refile this case in the appropriate forum." App. to Pet. for Cert. 20a–22a (capitalization in original omitted). The Court of Appeals for the Fifth Circuit reversed the District Court's judgment and remanded the case to that court. 312 F. 3d, at 173–174. Viewing *Newman-Green, Inc.* v. *Alfonzo-Larrain,* 490 U. S. 826 (1989), as "instructive," and *Caterpillar Inc.* v. *Lewis,* 519 U. S. 61 (1996), as "compel[ling]," the Court of Appeals found it unnecessary and inappropriate to "erase the result of [the trial and verdict] by requiring [the parties] to relitigate their claims." 312 F. 3d, at 171–174.

*Caterpillar* and *Newman-Green* are indeed the decisions most closely on point. In *Caterpillar*, plaintiff Lewis, a Kentucky citizen, filed a civil action in state court against two corporate defendants—Caterpillar Inc., a citizen of both Delaware and Illinois, and Whayne Supply Company, a Kentucky citizen. 519 U. S., at 64–65. Several months later, Liberty Mutual, a Massachusetts corporation, intervened as a plaintiff, asserting claims against both defendants. *Id.,* at 65. After Lewis settled with Whayne Supply, Caterpillar filed a notice of removal. *Ibid.* Lewis moved to remand the case to the state court on the ground that Liberty Mutual had not settled its claim against Whayne Supply, and that Whayne Supply's continuing presence as a defendant in the lawsuit defeated complete diversity. *Id.,* at 65–66. The District Court denied Lewis' motion to remand. *Id.,* at 66. Liberty Mutual and Whayne Supply subsequently settled, and the District Court dismissed Whayne Supply from the suit. *Ibid.*

The case proceeded to a jury trial, which yielded a verdict and corresponding judgment for Caterpillar. *Id.,* at 66–67. On appeal to the Court of Appeals for the Sixth Circuit, Lewis prevailed. *Id.,* at 67. Observing that, at the time of removal, diversity was incomplete, the appellate court accepted Lewis' argument that dismissal of the case for want of subject-matter jurisdiction was obligatory. *Ibid.* In turn, this Court reversed the Court of Appeals' judgment: "[A] district court's error in failing to remand a case improperly removed," this Court held unanimously, "is not fatal to the ensuing adjudication if federal jurisdictional requirements are met at the time judgment is entered." *Id.,* at 64.

*Newman-Green* concerned a state-law action filed in Federal District Court by an Illinois corporation against a Venezuelan corporation, four Venezuelan citizens, and a United States citizen domiciled in Venezuela. 490 U. S., at 828. After the District Court granted partial summary judgment for the defendants, the plaintiff appealed. *Ibid. Sua*

*sponte,* the Court of Appeals for the Seventh Circuit inquired into the basis for federal jurisdiction over the case, and concluded that the presence of the Venezuela-domiciled United States citizen spoiled complete diversity. *Id.,* at 828–829.[3] To cure the defect, the three-judge panel granted the plaintiff's motion to drop the nondiverse party, citing Federal Rule of Civil Procedure 21. *Newman-Green,* 490 U. S., at 829.[4] But the full Seventh Circuit, empaneled en banc, concluded that an appellate court lacks such authority. *Id.,* at 830–831. This Court reversed that determination. Federal appellate courts, the Court held, "posses[s] the authority to grant motions to dismiss dispensable nondiverse parties." *Id.,* at 836.[5]

As in *Caterpillar* and *Newman-Green,* minimal diversity within Article III's compass existed in this case from the start. See U. S. Const., Art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."); *State Farm Fire & Casualty Co.,* 386 U. S., at 531 ("Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens."). The jurisdictional flaw—in *Caterpillar, Newman-Green,* and this case—was the absence of complete diversity, required by the governing statute,

---

[3] A United States citizen with no domicil in any State ranks as a stateless person for purposes of 28 U. S. C. § 1332(a)(3), providing for suits between "citizens of different States and in which citizens or subjects of a foreign state are additional parties," and § 1332(a)(2), authorizing federal suit when "citizens of a State" sue "citizens or subjects of a foreign state." See *Newman-Green,* 490 U. S., at 828.

[4] Rule 21, governing proceedings in district courts, provides in relevant part: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

[5] After our decision, the Seventh Circuit dismissed the nondiverse defendant and remanded the case to the District Court. *Newman-Green, Inc. v. Alfonzo-Larrain,* 734 F. Supp. 1470, 1472 (ND Ill. 1990).

§ 1332(a), when the action commenced, a flaw eliminated at a later stage of the proceedings. Cf. *ante*, at 573 (describing *Caterpillar* and *Newman-Green* as cases in which "the less-than-complete diversity which had subsisted throughout the action had been converted to complete diversity between the remaining parties to the final judgment").

It bears clarification why this case, in common with *Caterpillar* and *Newman-Green*, met the constitutional requirement of minimal diversity at the onset of the litigation. True, Atlas' case involves a partnership, while the diversity spoiler in *Caterpillar* was a corporation and in *Newman-Green*, an individual. See *supra*, at 587–588 and this page. In *Carden* v. *Arkoma Associates*, this Court held that, in determining a partnership's qualification to sue or be sued under § 1332, the citizenship of each partner, whether general or limited, must be attributed to the partnership. See 494 U. S., at 195–196.

Notably, however, the Court did not suggest in *Carden* that minimal diversity, which is adequate for Article III purposes, would be absent when some, but not all, partners composing the "single artificial entity," *id.*, at 188, n. 1, share the opposing party's citizenship. To the contrary, the Court emphasized in *Carden* that Congress could, "by legislation," determine which of the "wide assortment of artificial entities possessing different powers and characteristics . . . is entitled to be considered a 'citizen' for diversity purposes, and which of their members' citizenship is to be consulted." *Id.*, at 197. Congress would be disarmed from making such determinations—for example, from legislating that only the citizenship of general partners counts for § 1332 purposes—if Article III itself commanded that each partner's citizenship, limited and general partner's alike, inescapably adheres to the partnership entity. See *ibid.*; cf. *Steelworkers* v. *R. H. Bouligny, Inc.*, 382 U. S. 145, 153 (1965) (assimilating unincorporated labor unions to the status of corporations for diversity purposes, instead of counting each member's citizenship,

is a matter "suited to the legislative and not the judicial branch"). Just as Article III did not dictate the *Carden* decision, so the question here is plainly subconstitutional in character.

B

Petitioner Dataflux maintains, and the Court agrees, see *ante*, at 573–574, that this case is not properly bracketed with *Caterpillar*, where the subtraction of a party yielded complete diversity; instead, according to Dataflux, this case should be aligned with those in which an individual plaintiff initially shared citizenship with a defendant, and then, post-commencement of the litigation, moved to another State. See Brief for Petitioner 12–14, and n. 9, 23–24; Tr. of Oral Arg. 8–11. In my view, this case ranks with *Caterpillar* and is not equivalent to the case of a plaintiff who moves to another State to create diversity not even minimally present when the complaint was filed.

It has long been clear that "if a citizen sue[d] a citizen of the same state, he [could not] give jurisdiction by removing himself, and becoming a citizen of a different state." *Conolly*, 2 Pet., at 565.[6] When that sole plaintiff files suit in federal court, there is no semblance of Article III diversity; his move to another State manufactures diversity of citizenship that did not exist even minimally at the outset. *Caterpillar* and *Newman-Green*, by contrast, involved parties who were minimally, but not completely, diverse at the time federal-court proceedings began. *Caterpillar*, 519 U. S., at

---

[6] In *Conolly*, a party "was struck out of the bill before the cause was brought before the court." 2 Pet., at 564. Since *Conolly*, the Court has addressed the time-of-filing rule in a variety of cases in which the party lineup changed during the pendency of the litigation. See *supra*, at 584; *ante*, at 575, n. 5. The Court, however, has not previously ruled on a case resembling the controversy at hand, *i. e.*, one involving an association whose citizenship, for diversity purposes, is determined by aggregating the citizenships of each of its members. With equal plausibility, such an association could be characterized as an "aggregation" composed of its members, or an "entity" comprising its members.

64–65; *Newman-Green*, 490 U. S., at 828; *supra*, at 587–589. The postcommencement party lineup changes in *Caterpillar* and *Newman-Green* simply trimmed the litigation down to an ever-present core that met the statutory requirement.[7]

The same holds true for Atlas. No partner moved. Instead, those that spoiled statutory diversity dropped out of the case as did the nondiverse parties in *Caterpillar* and *Newman-Green*. See *supra*, at 587–589. In essence, then, this case seems to me indistinguishable from one in which there is "a change in the parties to the action." *Ante*, at 575.[8] As the Court correctly states, the crux of our disagreement lies in whether to "treat a change in the composition of a partnership like a change in the parties to the action." *Ante*, at 578. In common with Dataflux, the Court draws no distinction between an individual plaintiff who changes her citizenship and an enterprise composed of diverse persons, like Atlas, from which one or more original

---

[7] *Anderson* v. *Watt*, 138 U. S. 694 (1891), see *ante*, at 571–572, is not altogether in tune with *Caterpillar* and *Newman-Green*. In *Anderson*, coexecutors sued for the benefit of an estate. 138 U. S., at 703. One of the coexecutors, it turned out, shared common citizenship with two of the defendants. To salvage the adjudication, the nondiverse coexecutor sought to withdraw both as executor and as plaintiff, but the Court declined to give effect to the postfiling change in the party lineup. *Id.*, at 708. The Court would harmonize *Anderson* with *Caterpillar* and *Newman-Green* by attributing entity, rather than aggregate, status to the *Anderson* coexecutors. *Ante*, at 572, n. 3. But that characterization is hardly preordained. If, as it seems to me, either characterization would be plausible, *Caterpillar* and *Newman-Green* suggest that the one preserving the adjudication ought to hold sway.

[8] While a partnership may be characterized as a "single artificial entity," *Carden* v. *Arkoma Associates*, 494 U. S. 185, 188, n. 1 (1990), a district court determining whether diversity jurisdiction exists looks "to the citizenship of the several persons composing [the entity]," *Great Southern Fire Proof Hotel Co.* v. *Jones*, 177 U. S. 449, 456 (1900). *I. e.*, the district court looks to the citizenship of each general and limited partner, just as in multiparty litigation the court looks to the citizenship of each litigant joined on the same side. See *supra*, at 585–586.

members exit. See *ante,* at 575 ("The purported cure [in this case] arose not from a change in the parties to the action, but from a change in the citizenship of a continuing party."). Resisting that far-from-inevitable alignment, I would bracket the multimember enterprise with partially changed membership together with multiparty litigation from which some of the originally joined parties drop. I would do so on the ground that in procedural rulings generally, even on questions of a court's adjudicatory authority in particular, salvage operations are ordinarily preferable to the wrecking ball.

### C

Petitioner Dataflux sees *Caterpillar* as a ruling limited to removal cases, and *Newman-Green* as limited to court-ordered dismissals of nondiverse parties. See 312 F. 3d, at 173–174; Brief for Petitioner 23, 26–27; Reply Brief for Petitioner 11; Tr. of Oral Arg. 15–16. True, the court's attention may be attracted to the jurisdictional question by a motion to remand a removed case or a motion to drop a party. But, as the Fifth Circuit observed, "the principle of these cases is [not] limited to only the exact same procedural scenarios." 312 F. 3d, at 173. It would be odd, indeed, to hold, as Dataflux's argument suggests, that jurisdictional flaws fatal to original jurisdiction are nonetheless tolerable when removal jurisdiction is exercised. Removal jurisdiction, after all, is totally dependent on satisfaction of the requirements for original jurisdiction. See 28 U. S. C. § 1441(a) ("any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to [a] district court of the United States"). The "considerations of finality, efficiency, and economy" central to the *Caterpillar* Court's treatment of a failure to satisfy "the [complete-diversity] requirement of the removal statute, 28 U. S. C. § 1441(a)," *ante,* at 574 (internal quotation marks omitted), have equal force in appraising the *"statutory* defect" here, *ibid.* (emphasis in

original), *i. e.*, Atlas' failure initially to satisfy the complete-diversity requirement of § 1332(a).

Moreover, by whatever route a case arrives in federal court, it is the obligation of both district court and counsel to be alert to jurisdictional requirements. See, *e. g., Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534, 541 (1986) ("every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it" (quoting *Mitchell* v. *Maurer*, 293 U. S. 237, 244 (1934))); *United Republic Ins. Co., in Receivership* v. *Chase Manhattan Bank*, 315 F. 3d 168, 170–171 (CA2 2003) ("We have . . . urged counsel and district courts to treat subject matter jurisdiction as a threshold issue for resolution . . . ."); *United States* v. *Southern California Edison Co.*, 300 F. Supp. 2d 964, 972 (ED Cal. 2004) (district courts have an "independent obligation to address [subject-matter jurisdiction] *sua sponte*" (internal quotation marks omitted)); *Trawick* v. *Asbury MS Gray-Daniels, LLC*, 244 F. Supp. 2d 697, 699 (SD Miss. 2003) (criticizing counsel for failing to do the "minimal amount of research" that would have revealed the absence of subject-matter jurisdiction). But cf. *ante*, at 580 (time-of-filing rule should be rigidly applied when "no judicial action . . . was necessary to get the jurisdictional spoilers out of the case"). That obligation is equally applicable to cases initially filed in federal court and cases removed from state court to federal court.

In short, the Fifth Circuit correctly comprehended the essential teaching of *Caterpillar* and *Newman-Green:* The generally applicable time-of-filing rule is displaced when (1) a "jurisdictional requiremen[t] [is] not met, (2) neither the parties nor the judge raise the error until after a jury verdict has been rendered, or a dispositive ruling [typically, a grant of summary judgment] has been made by the court, and (3) before the verdict is rendered, or [the dispositive] ruling

is issued, the jurisdictional defect is cured." 312 F. 3d, at 174.[9]

## D

The "considerations of finality, efficiency, and economy" the Court found "overwhelming" in *Caterpillar* and *Newman-Green* have undiluted application here. *Caterpillar*, 519 U. S., at 75; see *Newman-Green*, 490 U. S., at 836–837. See also *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 191–192, and n. 5 (2000) (noting stricter approach to standing than to mootness in view of "sunk costs" once a "case has been brought and litigated"). In *Newman-Green*, this Court observed that rigid insistence on the time-of-filing rule, rather than allowing elimination of

---

[9] According to the majority, it would be "unsound in principle and certain to be ignored in practice" to decline to apply the time-of-filing rule only in those cases where the flaw is drawn to a court's attention after a full adjudication of the case, whether through trial or by a dispositive court ruling. *Ante*, at 575–576. Declining to apply the time-of-filing rule only in those cases, the Court suggests, can be justified only on the theory that "the party who failed to object before the end of trial [or dispositive court ruling] forfeited his objection." *Ante*, at 576 (citing *Kontrick* v. *Ryan*, 540 U. S. 443, 456 (2004)). The time-of-filing rule, however, is a court-created rule, see *supra*, at 583; it is therefore incumbent on the Court to define the contours of that rule's application. The Fifth Circuit's decision rested not on a forfeiture theory; rather, the decision accurately reflected the judicial economy underpinnings of the time-of-filing rule. True, as the Court observes, judicial economy concerns might be pressing even when a case is not fully adjudicated through trial or summary pretrial disposition. See *ante*, at 576–577. When a district court has so fully adjudicated the case, however, there can be no doubt that the "sunk costs to the judicial system," *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 192, n. 5 (2000), have become "overwhelming," *Caterpillar Inc.* v. *Lewis*, 519 U. S. 61, 75 (1996). That the rule advanced by the Court of Appeals is underinclusive does not make it "illogic[al]," *ante*, at 576; instead, the limitation makes the rule readily manageable. To hold the time-of-filing rule developed by this Court inapplicable here merely abjures mechanical extension of the rule in favor of responding sensibly to the rule's underlying justifications when those justifications are indisputably present.

the jurisdictional defect by dropping a dispensable party, would mean an almost certain replay of the case, with, in all likelihood, the same ultimate outcome. 490 U. S., at 837.[10] Similarly here, given the October 2000 jury verdict of $750,000 and the unquestioned current existence of complete diversity, Atlas can be expected "simply [to] refile in the District Court" and rerun the proceedings. See *ibid.*[11] No legislative prescription, nothing other than this Court's readiness to cut loose a court-made rule from common sense, accounts for waste of this large order.

The Court hypothesizes that Atlas and Dataflux will now settle to avoid fresh litigation costs. *Ante,* at 581. The majority's forecast, however, ignores the procedural history of

---

[10] In stark contrast to today's decision, see *ante,* at 580–582, the *Newman-Green* Court said: "If the entire suit were dismissed, Newman-Green would simply refile in the District Court . . . and submit the discovery materials already in hand. . . . Newman-Green should not be compelled to jump through [such] judicial hoops merely for the sake of hypertechnical jurisdictional purity." 490 U. S., at 837.

[11] The statute of limitations is unlikely to bar the repeat performance given the representation of counsel for both Atlas and Dataflux that "a [Texas] savings statute, assuming Texas law applies, . . . would allow Atlas to refile suit." Tr. of Oral Arg. 22; see *id.,* at 31. See also App. to Pet. for Cert. 22a (District Court order staying "the statute of limitations for the claims alleged in this case"); *supra,* at 586. Although counsel did not provide a citation to the Texas saving statute, I note a provision of that State's law, Tex. Civ. Prac. & Rem. Code Ann. § 16.064 (1997), covering cases originally filed in the wrong forum: "The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if" the first action is dismissed for "lack of jurisdiction." This prescription, described as "remedial in nature," has been "liberally construed." *Vale* v. *Ryan,* 809 S. W. 2d 324, 326 (Tex. App. 1991). Counsel for both Atlas and Dataflux also suggested New York law may apply. See Tr. of Oral Arg. 22, 31. New York has a saving provision that appears to allow refiling just as Texas law would. See N. Y. Civ. Prac. Law § 205(a) (West 2003) ("If an action is timely commenced and is terminated," *e. g.,* for lack of jurisdiction, "the plaintiff . . . may commence a new action . . . within six months . . . .").

this case. Knowing full well the first jury verdict, the parties on two occasions missed clear opportunities to settle: after the District Court's dismissal and after the Court of Appeals' reversal. Instead, the parties "waste[d] time and resources," including 3½ years on a jurisdictional question. *Ibid.* Even with the jurisdictional question resolved in its favor, Dataflux would now weigh against settlement the possibility that a new panel of jurors, and tactical knowledge gleaned from the first trial, could yield a different outcome the second time around. Atlas, too, might decline to settle: It prevailed once in a jury trial, and committed 6½ years to litigation, see *ante*, at 582, a cost that is rational to ignore, but, in practice, hard to sideline. In short, settlement, which depends on the parties' shared estimate of likely litigation outcomes, is hardly guaranteed.

In two respects, there is stronger cause for departure from the time-of-filing rule in Atlas' case than there was in *Caterpillar*. See *supra*, at 587 (discussing *Caterpillar*). First, the *Caterpillar* plaintiff, judgment loser in the federal trial court, had timely but fruitlessly objected to the defendant's improper removal. 519 U. S., at 74. The plaintiff in *Caterpillar*, this Court acknowledged, had done "all that was required to preserve his objection to removal." *Ibid.* Though mindful of the "antecedent statutory violatio[n]," the Court declined to disturb the District Court's final judgment on the merits. *Id.*, at 74–75. The defendant in this case, Dataflux, in seeking to erase the trial and verdict here, resembles the plaintiff in *Caterpillar*, except that Dataflux raised its subject-matter jurisdiction objection only *after* the parties had become completely diverse. Cf. 312 F. 3d, at 170. It is one thing to preserve jurisdictional objections so long as the jurisdictional flaw persists, see *Kontrick* v. *Ryan*, 540 U. S. 443, 455 (2004); *Capron* v. *Van Noorden*, 2 Cranch 126 (1804), quite another to tolerate such an objection after the initial flaw has disappeared from the case.

The Court sustains these outcomes: The *Caterpillar* plaintiff, whose prompt resistance to removal would generally have garnered a remand to the state forum plaintiff had originally selected, is nevertheless bound to an adverse federal-court judgment; the defendant, Dataflux here, after incorrectly conceding federal subject-matter jurisdiction in its answer, see App. 35a, and leaving the record uncorrected until the jury favored the plaintiff, is allowed to return to square one, unburdened by the adverse judgment. There is no little irony in that juxtaposition, all the more so given the absence of any charge of manipulation in this case.

Nor would affirmance of the Fifth Circuit judgment entail a significant risk of manipulation in other cases. Rarely, if ever, will a plaintiff bring suit in federal district court, invoking diversity jurisdiction under § 1332(a), with the knowledge that complete diversity does not exist, but in the hope of a postfiling jurisdiction-perfecting event. Such a plaintiff's anticipation is likely to be thwarted by the court's or the defendant's swift detection of the jurisdictional impediment. Furthermore, a plaintiff who ignores threshold jurisdictional requirements risks sanctions and "the displeasure of a district court whose authority has been improperly invoked." *Caterpillar,* 519 U. S., at 77–78. The Court's fears about the "litigation-fostering effect" of exceptions to the time-of-filing rule, *ante,* at 581, thus appear more imaginary than real. No wave of new jurisdictional litigation is likely, as the federal courts' experience after *Caterpillar* and *Newman-Green* shows.

Also distinguishing the two cases, in *Caterpillar,* the removing defendant "satisfied with only a day to spare the statutory requirement that a diversity-based removal take place within one year of a lawsuit's commencement." 519 U. S., at 65 (citing 28 U. S. C. § 1446(b)). Had that defendant remained in state court pending the settlement that left only completely diverse parties in the litigation, the one-year limitation on removal would have barred the way to federal

court. Nothing in the record or briefing here, however, suggests that Atlas filed precipitously in federal court in the hope of outpacing a fast-running limitations period; on the contrary, Atlas' complaint rested on events that occurred only ten months prior to the commencement of the action, see App. 18a, 22a–23a, and therefore fell comfortably within any applicable time bar.[12] This case thus presents no risk that refusal to treat an initial jurisdictional flaw as determinative will *de facto* extend a limitations period. Cf. 13B Wright, Miller, & Cooper, Federal Practice and Procedure § 3608, p. 459.

In sum, the Court's judgment effectively returns this case for relitigation in the very same District Court in which it was first filed in 1997. Having lost once, Dataflux now gets an unmerited second chance, never mind "just how much time will be lost along the way." *Newman-Green*, 490 U. S., at 837, n. 12 (internal quotation marks omitted). Nothing is gained by burdening our district courts with the task of replaying diversity actions of this kind once they have been fully and fairly tried. Neither the Constitution nor federal

---

[12] At oral argument, counsel for Atlas and Dataflux indicated that either New York or Texas law would supply the governing limitations period. See Tr. of Oral Arg. 22, 31. The Texas limitations period for contract and *quantum meruit* actions is four years. See *W. W. Laubach Trust/The Georgetown Corp. v. The Georgetown Corp./W. W. Laubach Trust*, 80 S. W. 3d 149, 160 (Tex. App. 2002) ("Breach of contract claims are generally governed by a four year statute of limitations." (citing Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (1986))); *Mann v. Jack Roach Bissonnet, Inc.*, 623 S. W. 2d 716, 718 (Tex. Civ. App. 1981) ("[The] suit to recover on quantum meruit . . . is a species of a suit for debt," subject to the limitations period for debt actions contained in § 16.004.). New York allows six years for contract and *quantum meruit* actions. See *In re R. M. Kliment & Frances Halsband, Architects*, 3 App. Div. 3d 143, 147, 770 N. Y. S. 2d 329, 332 (1st Dept., 2004) ("Breach of contract actions are subject generally to a six-year statute of limitations." (internal quotation marks omitted)); *Eisen v. Feder*, 307 App. Div. 2d 817, 818, 763 N. Y. S. 2d 279, 280 (1st Dept., 2003) (a six-year statute of limitations applies to *quantum meruit* actions, citing N. Y. Civ. Prac. Law § 213.2 (West 2003)).

statute demands a time-of-filing rule as rigid as the one the Court today installs.

The Court invokes "175 years" of precedent, *ante,* at 575, endorsing a time-of-filing rule that, generally, is altogether sound. On that point, the Court is united. See *supra,* at 583–584. For the class of cases over which we divide—cases involving a postfiling change in the composition of a multi-member association such as a partnership—the Court presents no authority impelling the waste today's judgment approves. Even if precedent could provide a basis for the Court's disposition, rules fashioned by this Court for "the just, speedy, and inexpensive determination [of cases]," Fed. Rule Civ. Proc. 1, should not become immutable at the instant of their initial articulation. Rather, they should remain adjustable in light of experience courts constantly gain in handling the cases that troop before them. See *Great-West Life & Annuity Ins. Co.* v. *Knudson,* 534 U. S. 204, 233 (2002) (GINSBURG, J., dissenting); *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.,* 527 U. S. 308, 336–337, and n. 4 (1999) (GINSBURG, J., concurring in part and dissenting in part) (recognizing, in line with contemporary English decisions, dynamic quality of equity jurisprudence in response to evolving social and commercial needs). I would affirm the judgment of the Fifth Circuit, which faithfully and sensibly followed the path the Court marked in *Newman-Green* and *Caterpillar.*