**IN RE: IN PLAY MEMBERSHIP GOLF, INC., Debtor.**

**In Play Membership Golf, Inc., Plaintiff,**

v.

**Billy Casper Golf, LLC, Defendant.**

Bankruptcy Case No. 13–14422 EEB
Adversary Proceeding No. 15–1191 EEB

United States Bankruptcy Court,
D. Colorado.

Signed September 29, 2017

Antonio L. Converse, Patrick D. Vellone, Denver, CO, for Plaintiff.

Greg Hearing, Thomas B. Quinn, Denver, CO, for Defendant.

---

## ORDER DISMISSING ADVERSARY PROCEEDING FOR LACK OF SUBJECT MATTER JURISDICTION

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER is before the Court on the parties' supplemental briefs filed at the Court's request to assist the Court in its determination of whether it has jurisdiction over this case. At the outset of this litigation, the Debtor's largest secured creditor, Mile High Banks (the "Bank") was a defendant. Some of the claims the Debtor asserted against the Bank gave rise to core jurisdiction. Following the dismissal of all claims against the Bank and other events that have transpired, the Court finds the remaining claims are not core proceedings and they are no longer "related to" an open bankruptcy case. The only issue is whether the Court should exercise its discretion to retain jurisdiction or dismiss this case.

1. The facts set forth in this ruling are based on: the Debtor's Amended Complaint and its exhibits, the parties' briefs, the Debtor's Fourth Amended Plan of Reorganization, the Bank's Response to Verified Motion for Temporary Restraining Order and Preliminary Injunction, and the Debtor's March 27, 2017

## I. BACKGROUND

The facts relevant to a determination of jurisdiction are undisputed in this case.[1] The Debtor owned and operated the Plum Creek and Deer Creek golf courses in Colorado. The Bank held a first priority lien on both courses owned by the Debtor and on a third course in Fort Worth, Texas, owned by a related entity. After the Bank declared its loans in default and had a receiver appointed by the state court, the Debtor filed its chapter 11 petition on March 22, 2013.

Almost one year later, on March 7, 2014, the Debtor filed its Fourth Amended Plan of Reorganization (the "Plan").[2] The Plan incorporated the terms of an agreement between the Debtor and the Bank. The parties agreed that the Bank's claim would be bifurcated into a secured claim in the amount of $4.5 million and an unsecured deficiency claim of approximately $6.8 million. The Debtor agreed to execute three promissory notes to reflect the indebtedness: Note A in the amount of $2.65 million, Note B in the amount of $1.85 million, and Note C in the amount of $6.8 million. Notes A and B were to represent the secured portion of the Bank's claim and Note C represented the unsecured claim. Both Notes A and B were to mature on the earlier of: a sale of the golf courses, a refinancing of the indebtedness, or August 31, 2015 (the "Closing Date"). In the interim, the Debtor was obligated to retain an independent management company to operate the golf courses. If the Debtor fully satisfied the Bank's secured claim within twelve months from the confirmation or-

Response to an Order to Show Cause to Debtor.

2. The Plan includes the amendments made in the Debtor's March 13, 2014 Errata to Debtor's Fourth Amended Plan of Reorganization and Fourth Amended Disclosure Statement.

der, Note C would be forgiven. If it took the Debtor longer than one year to repay but it was still accomplished prior to the Closing Date, then Note C would be discounted by fifty percent. If Notes A and B were not paid before the Closing Date, there would be no forgiveness of the deficiency claim. If the Debtor failed to sell or refinance by the Closing Date, the Bank could also record deeds-in-lieu of foreclosure that the Debtor had executed and placed into escrow.

The Plan also obligated the Debtor to make interim payments. On the Plan's effective date, the Debtor was required to pay the Bank $500,000 and to begin monthly payments on its secured claims. By the Closing Date, it had fully repay all secured claims. Non-priority unsecured creditors were to be paid either within thirty days of the Plan's effective date from a pro rata distribution of $25,000 or they could elect to wait and receive full payment at the sale or refinancing of the real property.

The Court confirmed the Plan on August 11, 2014. The parties disputed whether the Plan's effective date was November 1, 2014 or December 1, 2014, but the $500,000 payment to the Bank was due no later than December 1. The Debtor was unable to meet this deadline. It requested and obtained several extensions. According to the Bank, it agreed to the extensions because the Debtor represented it had a qualified buyer for the Plum Creek golf course, who had made a deposit toward the purchase price. The Bank later asserted that the Debtor fraudulently induced the extensions because the "deposit" it passed on to the Bank did not come from a prospective buyer, but from operating funds generated by the golf courses. The last extension expired on January 2, 2015.

In accordance with its proposed Plan, the Debtor hired Defendant Billy Casper Golf, LLC ("BCG") as its independent management company in April, 2014. This new relationship, however, quickly soured. By the end of October, 2014, the Debtor had terminated BCG's contract and BCG had ceased working for the Debtor. The Debtor alleges that BCG failed to adhere to its budget, that it employed third parties without first obtaining the Debtor's consent, and that it failed to meet performance benchmarks under its management agreement. Following termination, BCG used all or most of the remaining operating funds to pay itself management fees, incentive fees, and termination fees. The Debtor claims these payments were unauthorized and in violation of the management contract. It has asserted claims against BCG for civil theft, conversion, unjust enrichment, and breach of the management agreement.

The Debtor sold the Plum Creek course in January, 2015. At that time, the Debtor distributed over $1.6 million to its creditors, including $1.2 million to the Bank. These payments satisfied its effective date obligations, fully paid some secured creditors, and paid any unsecured creditors that had elected to receive a reduced distribution.

However, the Debtor disputed the Bank's application of $500,000 of its payment toward the unsecured Note C, instead of the secured Notes A and B. It filed this adversary proceeding on May 14, 2015, asserting claims against the Bank for declaratory judgment, breach of the Plan, breach of the loan agreement, and for injunctive relief. The Court never had the opportunity to hear the Bank's position on the proper application of the payment. In defense of the preliminary injunction motion, the Bank recounted its view of numerous Plan defaults and misrepresentations allegedly made by the Debtor. It also requested that the Court dismiss the

claims against the Bank because these claims were outside the Court's subject matter jurisdiction or that it exercise discretionary abstention to allow these claims to proceed in state court. Since some of the Debtor's claims against the Bank involved Plan interpretation and enforcement, which are core jurisdictional matters, the Court denied the requests for dismissal or abstention. Instead the Court set an evidentiary hearing on the preliminary injunction motion. Shortly before this hearing date, the Debtor and the Bank settled and filed a notice of dismissal of all claims against the Bank on June 16, 2015. Following dismissal of the Bank, the Court did not have further contact with this case until the parties filed cross motions for summary judgment.

The summary judgment motions caused this Court to examine more closely the nature of the remaining claims. This prompted the Court to order briefs on the jurisdictional issues. Upon review of the initial briefs, the Court realized that nothing in the adversary or the main case disclosed the status of the Plan. Consequently, the Court ordered the parties to supplement their briefs. The Debtor's supplement revealed that, by August 31, 2015, just over three months after it had filed this adversary proceeding, the Debtor had satisfied all remaining Plan obligations when it refinanced the debt on the Deer Creek course. At the Court's prompting, the Debtor then applied for a final decree on December 9, 2016. The Court entered the decree on January 10, 2017 and closed the case on January 13, 2017.[3]

---

**3.** Because the parties' arguments regarding subject matter jurisdiction initially indicated that the Debtor had not consummated its Plan, the Court reopened the underlying case and directed the parties' to supplement their briefs to clarify this issue. Upon its review of

## II. DISCUSSION

### A. The Court's Obligation to Examine its Subject Matter Jurisdiction

■■■ Federal courts " 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party,' and thus a court may *sua sponte* raise the question of whether there is subject matter jurisdiction '*at any stage in the litigation.*'" *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (quoting *Arbaugh v. Y. & H Corp.*, 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006)) (emphasis added). If a court lacks subject matter jurisdiction over a dispute, parties cannot create it by agreement or by consent, or by the terms of a plan of reorganization. *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004). "[N]either the bankruptcy court nor the parties can write their own jurisdictional ticket." *Id.*

### B. General Principles of Bankruptcy Court Subject Matter Jurisdiction

■■■ Congress limited and defined the subject matter jurisdiction of the bankruptcy courts in 28 U.S.C. § 1334. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). According to 28 U.S.C. §§ 157(a) and 1334, bankruptcy courts, upon referral from the federal district courts, may exercise jurisdiction over three types of proceedings: (1) cases under title 11; (2) civil proceedings "arising under" or "arising in" a case under title 11; and (3) civil proceedings "related to" cases under title 11. Core

---

the supplemental briefs, the Debtor's Response to Order to Show Cause, and the Debtor's Amended Final Report and Request for Final Decree, the Court reclosed the underlying bankruptcy case on August 17, 2017.

proceedings, or proceedings "arising under" or "arising in," are claims that have no existence outside of bankruptcy. *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990). "Related to" proceedings are those that do not depend on bankruptcy law for their existence. *Id.* A non-bankruptcy court could hear and determine "related to" proceedings. In order for the court to exercise subject matter jurisdiction over the Debtor's remaining claims against BCG, it must find that its jurisdiction falls into one of these three categories. This adversary proceeding is not a case under title 11. Nor is it a proceeding arising in or under title 11. All of the BCG claims arise under state law and the Debtor could have asserted them in state court. Thus, the only possible jurisdictional tether is "related to" jurisdiction.

In *Gardner*, the Tenth Circuit adopted the widely-used test for "related to" jurisdiction that the Third Circuit first formulated in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984). Under the *Pacor* test, bankruptcy courts have "related to" jurisdiction to hear a proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 743 F.2d at 994; *Gardner*, 913 F.2d at 1518. In 1995, the Supreme Court endorsed this test with the qualification that "related to" jurisdiction "cannot be limitless" and that "bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor." *Celotex Corp. v. Edwards*, 514 U.S. at 308 & n. 6, 115 S.Ct. 1493.

## C. Post–Confirmation Jurisdiction is Even More Narrow

When applied to post-confirmation proceedings, however, the *Pacor* test is both too narrow and too broad. It is too narrow because, in this case as well as in the vast majority of reorganization cases, confirmation of a debtor's plan vests the estate's property in the debtor and the estate ceases to exist. Applying the *Pacor* test literally would mean bankruptcy courts have no "related to" jurisdiction following confirmation. *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004) (recognizing difficulty with *Pacor* test post-confirmation because "it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred"). This test is also too broad because bankruptcy courts have always viewed confirmation as an event that severs the once close ties between the former debtor and the bankruptcy court. As one court put it:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the *protection* of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.

*Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991) (emphasis in original). As another court stated: "as the corporation moves on, the connection [with its bankruptcy case] attenuates." *Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.)*, 410 F.3d 100, 107 (1st Cir. 2005).

Virtually all courts that have considered the question have concluded that, after confirmation, the "related to" jurisdiction of the bankruptcy courts shrinks. *See Santander Consumer, USA, Inc. v. Houlik (In re Houlik)*, 481 B.R. 661, 675 (10th Cir. BAP 2012); *Penthouse Media Group v. Guccione (In re General Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y.

2005). Once again, the Third Circuit has developed the most influential description of the bankruptcy court's post-confirmation "related to" jurisdiction. In *Resorts International*, the Court considered whether the bankruptcy court had subject matter jurisdiction over malpractice claims of a litigation trust established under a chapter 11 plan against an accounting firm that provided tax advice and accounting services to the trust. The court recognized that the *Pacor* test is unwieldy in the post-confirmation context and that after confirmation of a plan the bankruptcy court's jurisdiction diminishes. 372 F.3d at 165. It held that "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding" and whether "the claim ... affect[s] an integral aspect of the bankruptcy process." *Id.* at 166–67. In describing the type of proceeding over which a bankruptcy court retains jurisdiction, the court answered, "[m]atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 167. Ultimately, the court in *Resorts International* determined the bankruptcy court could not exercise subject matter jurisdiction over the malpractice claims. Even though the plan created the litigation trust and required the trust to retain an accounting firm, and even though the resolution of the claims would directly impact the recovery to former creditors of the debtor, the Third Circuit found the connection to the bankruptcy case and confirmed plan too remote. It emphasized that the proceeding did not affect the estate, it would have only incidental effect on the reorganized debtor, it would not interfere with the implementation of the plan, and it would not require the court to interpret or construe the plan or the incorporated trust agreement. *Id.* at 169–70.

Many courts, including the Courts of Appeal for the Fourth and Ninth Circuits, have adopted the *Resorts International* close nexus test to evaluate post-confirmation "related to" jurisdiction. *See Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005). The Fifth Circuit Court of Appeals has adopted a narrower test, limiting post-confirmation jurisdiction to "matters pertaining to the implementation or execution of the plan." *See Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390–91 (5th Cir. 2001). Thus, a proceeding does not have a close nexus to a bankruptcy plan or case simply because the bankruptcy plan or case created the context for the controversy. *Resorts Int'l*, 372 F.3d at 170 (concluding that "[t]hough the Plan and Trust Agreement provide the context of the case, this bare factual nexus is insufficient to confer bankruptcy jurisdiction"). In other words, the fact that a relationship or a dispute first arose during the course of a bankruptcy case does not by itself satisfy this close nexus test. The proper inquiry is whether the *outcome* of the claims could affect the implementation, execution, or consummation of the Plan. *Sea Hawk Seafoods, Inc. v. Alaska (In re Valdez Fisheries Dev. Assoc., Inc.)*, 439 F.3d 545, 548 (9th Cir. 2006) (emphasis added).

The Tenth Circuit has not yet expressly adopted a test to define the scope of the bankruptcy court's post-confirmation "related to" jurisdiction. Prior to *Resorts International*, it had decided three cases involving post-confirmation jurisdiction, but without an in depth analysis of the jurisdictional issues. *See U.S. Trustee v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 150 F.3d 1233 (10th Cir. 1998); *Plotner v. AT & T Corp.*,

224 F.3d 1161 (10th Cir. 2000); *Peterson v. Fed. Trade Comm'n (In re Peterson)*, 6 Fed.Appx. 837 (10th Cir. 2001) (unpublished decision). In the latter case, however, the court described the proper test as a strict one, "looking to the proceeding's practical effect on implementation of the confirmed reorganization plan, rather than to its conceivable effect on the bankruptcy estate." *Id.* at 839.

More recently, lower appellate courts within the Tenth Circuit have considered the extent of post-confirmation jurisdiction. In *In re Houlik*, the court held that the bankruptcy court lacked post-confirmation subject matter jurisdiction over the debtors' claims against their truck lender for an allegedly wrongful repossession conducted post-confirmation. The court discussed both the Third Circuit's close nexus test and the Fifth Circuit's more narrow formulation. It decided that, no matter which test applied, the matter was beyond the bankruptcy court's post-confirmation "related to" jurisdiction. The court noted that the debtors had substantially consummated their plan, any damages awarded would benefit the debtors rather than their creditors, and the case did not involve interpretation or enforcement of the plan. It concluded that, even though the debtors brought the action, it "affects neither an integral aspect of the bankruptcy process, nor the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Santander Consumer, USA, Inc. v. Houlik (In re Houlik)*, 481 B.R. 661, 676 (10th Cir. BAP 2012).

In *Scarborough v. Angel Fire Resort Operations, LLC (In re Angel Fire Corp.)*, 2013 WL 1856350 (D. N.M. 2013) (unpublished opinion), the district court extensively analyzed the law on this issue and concluded that the Tenth Circuit and its Bankruptcy Appellate Panel have effectively applied the close nexus test to evaluate post-confirmation subject matter jurisdiction. 2013 WL 1856350 at *12. Applying that test, the *Angel Fire* court determined that the bankruptcy court lacked jurisdiction over a property owner's request for declaratory relief concerning a negative easement created to effectuate a chapter 11 plan. Even though the action involved interpretation of the plan and the incorporated easement, the court found no close nexus where the court had long since closed the underlying bankruptcy case, the debtor was dissolved, and the lawsuit would have no effect on creditor recovery. The court concluded that "there is nothing left of the [bankruptcy case] that requires bankruptcy court administration." *Id.* at *16.

### D. Applying the Close Nexus Test

Based on the *Houlik* and *Angel Fire* cases, this Court concludes that the close nexus test is the broadest expression of the bankruptcy court's post-confirmation subject matter jurisdiction over "related to" matters. It is, therefore, appropriate to apply this test to the remaining claims in this proceeding. In doing so, the Court is mindful that this test "retains a certain flexibility," *Wilshire Courtyard v. Cal. Franchise Tax Board (In re Wilshire Courtyard)*, 729 F.3d 1279 (9th Cir. 2013), necessarily adapting to the particular circumstances in which a court applies it. For example, in *Resorts International*, the court listed plan interpretation as one of the matters that has a sufficiently close nexus with a bankruptcy case to confer post-confirmation jurisdiction on the bankruptcy court. *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004). However, the Third Circuit was careful to say that its list describes actions that "typically," though not necessarily or always, have the required connection. *Id.* When applying

this test in *Angel Fire,* the court concluded that a request for plan interpretation was insufficient to invoke the bankruptcy court's post-confirmation jurisdiction because the case was closed and resolution of the dispute would have no impact on creditor recovery. *In re Angel Fire Corp.,* 2013 WL 1856350 at *16. Thus, jurisdictional analysis must always be grounded in the overall context of a case. It is not a mathematical formula, allowing jurisdiction whenever a certain factor, or a number of factors, exist.

■ At the outset of this adversary action, some of the Debtor's claims against the Bank were clearly core proceedings. The Bank had credited $500,000 of the Debtor's $1.2 million payment in January, 2015 toward the unsecured Note C. In § 4.4(a), the Plan described the $500,000 payment obligation. It stated that "[t]he Bank has agreed that its *secured* claim shall be treated as follows: (a) Upon the Effective Date, Debtor shall pay Mile High Banks $500,000 ...." (emphasis added). Thus, from the Debtor's viewpoint, this language meant the Bank was obligated to apply this payment toward the secured portion of the Bank's claim. Its declaratory relief claim requested the Court's interpretation of this Plan provision. The injunctive relief claim was to stop the Bank from recording the deeds-in-lieu of foreclosure until the Court could rule on the declaratory relief claim. Thus, these two claims called for interpretation and enforcement of the Plan. Unfortunately, the Court did not immediately revisit the question of its jurisdiction upon the dismissal of these claims.

What remains now in this adversary action are the Debtor's claims against BCG for civil theft, conversion, unjust enrichment, and breach of the management agreement. All of these claims arise under state law and a state court could determine them. At the outset of this litigation, however, the Debtor's claims against BCG seemed intertwined with its claims against the Bank. The Debtor claimed that the Bank had breached its obligations under their settlement and, as a result, the Debtor could not meet its own obligations. For example, the Bank promised to allow the Debtor to draw on a $200,000 line of credit for operating needs, but then failed to make this available at critical junctures. According to the Debtor, the Bank also forced BCG on the Debtor but then BCG failed to perform as it had promised, reducing the Debtor's cash flow.

It was this Court's job to determine at the outset of this action whether the outcome of the claims could have affected an integral aspect of the bankruptcy process or the interpretation, implementation, consummation, execution, or administration of the Debtor's confirmed Plan. *See Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.,* 692 F.3d 283, 294 (3rd Cir. 2012) (citing *Grupo Dataflux v. Atlas Glob. Grp., L.P.,* 541 U.S. 567, 570–71, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004) (recognizing long standing rule that "the jurisdiction of the Court depends upon the state of things at the time of the action brought")); *Valley Historic Ltd. P'ship v. Bank of N.Y.,* 486 F.3d 831, 837 (4th Cir. 2007) (close nexus test "insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction"). If this Court had made a closer inspection when the Debtor first filed this case, it would have concluded, as it does now, that the BCG claims never had the requisite close nexus to the bankruptcy proceedings.

First, Article VI of the Plan provided that the Court's confirmation order would revest or transfer title to the Debtor's assets from the bankruptcy estate to the

reorganized debtor. Thus, there was no bankruptcy estate on the date the Debtor filed this adversary proceeding. Second, by January, 2015, the Debtor had distributed over $1.6 million to its creditors, including $1.2 million to the Bank. These payments satisfied all of its effective date obligations under the Plan, fully paid some of its secured creditors, and may have paid some unsecured creditors if any had elected to receive a reduced distribution. Thus, the Debtor had substantially consummated its Plan prior to filing this case on May 14, 2015. *See* 11 U.S.C. § 1101(2) (defining substantial consummation as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."); *see also Search Market Direct, Inc. v. Jubber (In re Paige)*, 584 F.3d 1327, 1341–42 (10th Cir. 2009). Finally, within three months of the filing of this action, the Debtor had fulfilled all its remaining Plan obligations. There was no longer any need to interpret or enforce the Plan. The Debtor's potential recovery on the BCG claims would not be used to satisfy creditor claims. In short, not only did these claims lack a close nexus, there was absolutely no nexus to administration of the bankruptcy case or Plan.

Despite the parties' arguments to the contrary, the dispute between the Debtor and BCG never required the Court to interpret or enforce the Plan. While the Plan required the Debtor to hire a management company satisfactory to the Bank, it did not specify that the Debtor had to hire BCG or any particular company. It did not incorporate the management agreement or any of its terms. The Plan itself did not require BCG to meet any particular performance standards or to contribute any funds from operation of the courses to fund Plan payments. Thus, the Debtor's claims against BCG have always been fundamentally different from those it asserted (and later dismissed) against the Bank. The Debtor's claims against BCG are akin to those raised in *Houlik* and *Resorts International.* Both of these courts recognized that the plaintiffs had the right to seek redress for their claims, but they had no need to bring their claims in the bankruptcy court. The same is true here.

Ironically, it is BCG that places the greatest emphasis on the argument that post-confirmation jurisdiction exists if a reorganized debtor claims the defendant's bad acts undermined the debtor's ability to fulfill its plan obligations. It relies on three decisions that stand for this proposition. In the first case, *Prithvi Catalytic, Inc. v. Microsoft Corp. (In re Prithvi Catalytic, Inc.)*, 2015 WL 1651433 (Bankr. W.D. Pa. April 8, 2015), the defendant allegedly lured away the debtor's employees, inviting them to violate their covenants not to compete with the Debtor. The confirmed plan was "undeniably premised" on the continuation of the reorganized debtor's business relationship with Microsoft for whom the debtor's employees worked. *Id.* at *2. Within a few months after confirmation, the reorganized debtor had lost "most of its employees and virtually all of its revenue." *Id.* at *3. The court said that the defendants' alleged bad acts were "not merely incidental to the [p]lan, they allegedly killed the [p]lan." *Id.* at *6. The court found that, because the reorganized debtor's adversary proceeding sought redress for the portion of plan funding that the debtor lost because of the defendants' injurious conduct, the claims implicated the integrity of the bankruptcy process and it had subject matter jurisdiction. *Id.* These facts are substantially different from the

present case. The Debtor's Plan was not "undeniably premised" on the Debtor's continued operations as it had always contemplated the alternative possibility of a sale of the golf courses. Moreover, BCG's alleged bad acts did not prevent the Debtor from satisfying its Plan obligations. It was able to satisfy its remaining obligations through the other option contemplated in the Plan, a refinancing of the debt secured against the Deer Creek course.

In the second case, *Donaldson v. Bernstein*, 104 F.3d 547 (3rd Cir. 1997), the court reopened a closed chapter 11 case, converted it to chapter 7, and then the chapter 7 trustee filed claims against the debtor's former officers for obtaining confirmation of the chapter 11 plan under false pretenses and for breaching their fiduciary duties to the debtor and the unsecured creditors by diverting business away from the reorganized debtor. The bankruptcy court specifically tailored the actual and punitive damages it awarded for the officers' breach of fiduciary duties to ensure that unsecured creditors would receive the full distribution the plan had promised. An open chapter 7 case in which a trustee pursues claims that will directly benefit creditors, and where the trustee essentially seeks to enforce the plan, is markedly different from a post-confirmation lawsuit benefitting only the reorganized debtor.

Finally, BCG relies on *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189 (9th Cir. 2005). In that case, the debtors, the state, and a number of other parties reached a settlement of the state's claims relating to reclamation and water treatment at two of the debtors' mines. The bankruptcy court approved the settlement agreement, which required the debtors to form a new corporation, RSC, to perform the reclamation work. The plan specifically incorporated the terms of the settlement agreement. Almost immediately after confirmation, problems arose. The state terminated RSC's services and hired its replacement. RSC and the liquidating trustee then sued the state and the substitute company alleging that the state had breached both the settlement agreement and the plan and that the state had committed fraud in the inducement of the settlement agreement. The Ninth Circuit found it had jurisdiction because resolution of the claims would "likely require interpretation of the [settlement agreement] and the Plan." 394 F.3d at 1194.

All three of the BCG's supporting cases are distinguishable from the present action. The Debtor's claims against BCG will not require interpretation of the Plan. Any recovery on these claims will not go to pay creditor claims. And BCG's actions did not prevent the Debtor from fulfilling its Plan obligations.

Given these circumstances, the Debtor's claims lack a sufficiently close nexus to the Plan. To hold otherwise, would "endlessly stretch a bankruptcy court's jurisdiction." *Pegasus Gold Corp.* 394 F.3d at 1194 n. 1 (rejecting argument that court had subject matter jurisdiction because the action could conceivably increase the recovery to creditors). The Debtor's claims are no different from any post-confirmation dispute between a reorganized debtor and its suppliers or service providers. After it confirmed its Plan, the Debtor was free of this Court's supervision and this Court is no longer the forum for the Debtor to seek relief if "something unpleasant" occurs. *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). As the court said in *Houlik*, the Court's decision does not mean the Debtor has no remedy—"only that it is a state court remedy and not a bankruptcy court remedy." *Santander Consumer,*

*USA, Inc. v. Houlik (In re Houlik)*, 481 B.R. 661, 676 (10th Cir. BAP 2012).

### E. No Other Provisions of the Bankruptcy Code Expand the Court's Jurisdiction

 "[T]he source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan. The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004) (*quoting U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 303 (5th Cir. 2002)). Contrary to this bedrock principle, litigants often argue that § 1142 may expand the bankruptcy court's statutory "related to" post-confirmation jurisdiction. Its subsection (a) provides that "the debtor ... shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a). Subsection (b) provides that the court "may direct the debtor and any other necessary party to execute or deliver ... any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b). While this statutory language appears to be expansive, courts have held that § 1142(b) "channels, but does not abrogate, the bankruptcy court's jurisdiction post-confirmation." *U.S. Trustee v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 150 F.3d 1233, 1237 (10th Cir. 1998) (quoting *U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 216 B.R. 764, 768–69 (W.D. Pa. 1997)). Whether a matter is within the Court's post-confirmation "related to" jurisdiction must be determined independently of § 1142(b). In *In re Houlik*, the court also concluded that "§§ 105, 1141, and 1142 of the Code

do not provide an independent basis for jurisdiction, and thus whether the bankruptcy court acted beyond the scope of its authority in this matter must be determined by closely analyzing whether its actions fall within the jurisdictional grant of 28 U.S.C. §§ 157 and 1334." 481 B.R. at 673.

### F. A Plan's Language Cannot Expand the Court's Jurisdiction

 Neither may a plan proponent expand the bankruptcy court's post-confirmation jurisdiction through a grant of jurisdiction in a plan of reorganization. In section 8.3 of the Plan, the Debtor outlined the Court's retention of jurisdiction post-confirmation. In pertinent part, it stated that this Court would "retain and have exclusive jurisdiction" to "determine such other matters as may be set forth in the Confirmation Order or as they may arise in connection with the Plan or the Confirmation order," and that it would "retain and have concurrent jurisdiction with any appropriate state court to determine all controversies, suits and disputes that may arise in connection with or interpretation enforcement or consummation of the Plan." Plan § 8.3. The Debtor may have intended this language to be broader than the close nexus test. Nevertheless, this provision cannot create jurisdiction broader than the Court's statutory grant of jurisdiction. *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004).

The debtor in *Valley Historic Ltd. Partnership v. Bank of New York* attempted to convince the court that the plan's language could confer broader jurisdiction. In that case, the debtor disputed whether its secured lender had properly increased loan payments pre-bankruptcy and declared the loan in default. *Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 834 (4th Cir.

2007). The debtor's confirmed plan provided that the bankruptcy court would liquidate the bank's claim, subject to the debtor's claims and setoffs, in an adversary proceeding over which the bankruptcy court would retain jurisdiction. The plan did not provide for the use of proceeds from this litigation to fund the plan. Instead, the plan said the debtor would satisfy its obligations entirely from post-petition earnings. After confirmation, however, the debtor's tenant vacated the debtor's property. Consequently, the debtor sold the property and used the sale proceeds to pay all of its creditors. Three months later, the debtor filed an adversary proceeding alleging pre-petition claims that the bank had breached its loan agreement as well as post-confirmation claims that the bank had tortiously interfered with the debtor's contractual relationship with its tenant. Despite the plan's retention of jurisdiction language, the court independently assessed its post-confirmation jurisdiction. Since the debtor sold its property instead of continuing to operate as the plan envisioned, and had substantially consummated its plan prior to filing the adversary proceeding, the court found there was "no conceivable bankruptcy administration purpose to be served by the Debtor's adversary proceeding." *Id.* at 837. Thus, it concluded that there was no close nexus to the bankruptcy plan or proceeding and the bankruptcy court lacked subject matter jurisdiction, despite language in the plan to the contrary.

Another court reached the same conclusion in the case of *Nobel Group, Inc. v. Cathay Bank (In re Nobel Group, Inc.)*, 529 B.R. 284 (Bankr. N.D. Cal. 2015). In that case, the debtor sold its real property prior to confirmation of its plan and paid its secured lender's claim in full, including disputed default interest. The debtor's confirmed plan provided that the bankruptcy court would retain jurisdiction over the debtor's claims to recover the default interest from the lender and expressly provided that the debtor would fund the plan, in part, through recovery from those claims. After it had substantially consummated its plan, the debtor filed an adversary proceeding asserting claims for breach of contract and declaratory relief as well as an objection to the lender's claim. Despite the plan's retention of jurisdiction over these claims, the bankruptcy court held that it lacked jurisdiction under the close nexus test. The Court ruled that the issues in the adversary proceeding did not require it to interpret the plan, the issues arose solely under state law and the plan had been substantially, although not fully, consummated. The court noted that, even though the plan provided for partial funding from funds recovered from the lawsuit, it was not a primary or major component of the plan. 529 B.R. at 292–93. Even if recovery on the claims could potentially increase the distribution to creditors, the court held that did not provide a sufficient basis for post-confirmation subject matter jurisdiction. *Id.* at 293 (quoting *Pegasus Gold Corporation*, 394 F.3d 1189, 1194 (9th Cir. 2005)); *see also Penthouse Media Group v. Guccione (In re General Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (that successful outcome to litigation might make it easier for debtor to satisfy plan obligations insufficient to confer subject matter jurisdiction). Thus, plan provisions purporting to expand a bankruptcy court's jurisdiction beyond its statutory authority are unenforceable and ineffective.

## G. Discretion to Retain or Dismiss Adversary Proceeding When Claims No Longer Have a Close Nexus

▮▮▮▮ Even if the Court had subject matter jurisdiction over the BCG claims at the outset of this case, it has an "unflag-

ging obligation to examine its subject matter jurisdiction at every stage of the proceedings." *Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 838 (4th Cir. 2007). When events transpire to destroy the jurisdiction that once existed, the bankruptcy court must reexamine whether it should continue to exercise jurisdiction. Most of the reported decisions discussing the decision to retain or dismiss claims, however, arise in a different context. They involve the dismissal of the main bankruptcy case while a related adversary proceeding is pending. In that context, courts have held that "the dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding which was related to the bankruptcy case at the time of its commencement." *Fidelity & Deposit Co. of Md. v. Morris (In re Morris)*, 950 F.2d 1531, 1534 (11th Cir. 1992); *Smith v. Commercial Banking Corp. (In re Smith)*, 866 F.2d 576 (3rd Cir. 1989); *Querner v. Querner (In re Querner)*, 7 F.3d 1199 (5th Cir. 1993). Rather the decision to retain jurisdiction or dismiss the action is left to the sound discretion of the court. *In re Morris*, 950 F.2d at 1534.

Under these circumstances, the decision to retain jurisdiction is analogous to the situation federal district courts face when deciding whether to continue to exercise federal court jurisdiction over pendent state law claims once the federal law claims have dropped out of the lawsuit. *Linkway Inv. Co. v. Olsen (In re Casamont Inv'rs, Ltd.)*, 196 B.R. 517, 522 (9th Cir. BAP 1996). "Generally where all federal law claims are eliminated before trial, the factors will favor declining to exercise jurisdiction over the remaining state law claims." *Id.* (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). However, dismissal is not automatic and federal courts must first consider several factors before decid-

ing to retain or dismiss the case without prejudice. *Id.* (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The factors they weigh are substantially similar to the factors bankruptcy courts employ when deciding to retain or dismiss an adversary proceeding after the dismissal of the main case.

"These factors include: (1) judicial economy; (2) fairness and convenience to the litigants; and (3) the degree of difficulty of the related legal issues involved." *In re Smith*, 866 F.2d at 580. Some courts describe these factors slightly differently: (1) judicial economy; (2) any inconvenience to the parties that would result from dismissal; (3) any prejudice that the parties would suffer; and (4) whether principles of comity dictate that the matter should be left to the state court. *See, e.g., In re Casamont Inv'rs, Ltd.*, 196 B.R. at 524–25. This Court would add two additional factors. It would also weigh whether the pending matter involves the integrity of the bankruptcy process, such as a claim for violation of the automatic stay or a claim alleging collusive bidding at a bankruptcy sale. *Johnson v. Smith (In re Johnson)*, 575 F.3d 1079, 1084 (10th Cir. 2009) (finding a stay violation claim remains viable despite termination of underlying bankruptcy case). Second, this Court would consider whether the parties have attempted to manipulate the Court's jurisdiction or otherwise abuse the litigation process. "[A] litigant [particularly a debtor] who didn't like the way his case was going could, even on the eve of judgment, engineer its dismissal, allowing him to start over in a different court." *In re Casamont Inv'rs, Ltd.*, 196 B.R. at 523 (quoting *Chapman v. Currie Motors, Inc.*, 65 F.3d 78, 81 (7th Cir. 1995)).

However, neither of the Court's proposed additional factors applies to the

present case. Thus, in exercising its discretion to retain or dismiss this adversary proceeding, the Court will adhere to the traditional test. Beginning with the first factor, judicial economy, the Court considers how long the case has been pending, how far the case has progressed, and how many judicial resources have already been expended on it. The Debtor filed this case on May 22, 2015, a little over two years ago. That is a significant period of time. However the Court has had almost no involvement with this case. After the dismissal of the Bank, the only things that the Court's docket reveals is a substitution of counsel, a modification of the scheduling Order, two notices of deposition, and the filing of cross motions for summary judgment. The Court has not yet made any substantive determinations. The case has not been set for trial. In fact, both parties do not believe a trial will be necessary, although the Court has serious doubts as to whether all of the issues briefed on summary judgment will truly be devoid of genuine issues of material fact.

Taking the next factors out of order, the Court considers the degree of difficulty of the related legal issues and whether principles of comity would indicate the matter is best left to the state courts. The parties' pending motions for summary judgment raise several issues requiring application of Colorado statutory, contract, and tort law and the intersection between them. These issues include: (1) whether the Management Agreement's provisions concerning notice of default were ambiguous; (2) whether the Debtor wrongfully terminated the Management Agreement; (3) whether the Debtor's claim for damages based on lost profits or future development revenues are too speculative and uncertain; (4) whether the Management Agreement's prohibition of consequential damages is enforceable and whether that determination is affected by the Debtor's tort claims; (5)

whether the Debtor's proof of damages is sufficient; (6) whether BCG committed civil theft or conversion or was unjustly enriched when it paid itself upon termination of the management contract; and (7) whether the economic loss rule bars the Debtor's claims for civil theft, conversion, and/or unjust enrichment. The last issue implicates a particularly complex and currently unsettled issue of Colorado law. In fact, the Colorado Supreme Court recently granted certiorari to review a decision of the Colorado Court of Appeals on this very issue. *See Bermel v. BlueRadios, Inc.*, 2017 WL 3016382 (Colo. July 3, 2017) (granting Petition for Writ of Certiorari). In *Bermel v. BlueRadios, Inc.*, —— P.3d ——, 2017 WL 710485 (Colo. App. Feb. 23, 2017), *cert. granted*, 2017 WL 3016382 (Colo. July 3, 2017), the Colorado Court of Appeals held that, because the economic loss rule is a judicial construct and a civil theft claim is a statutory cause of action, the economic loss rule does not preclude a cause of action under Colorado's Civil Theft Statute. The Colorado Supreme Court had declined to answer that question in a previous case, *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603 (Colo. 2016).

Finally, the Court considers whether dismissal would be inconvenient or prejudicial to either party. Of course, any time a court dismisses a case and the parties have to refile the case in another forum, there will be some inconvenience. In this case, the parties would have to change the captions on their pleadings, pay another filing fee, and wait two months for the case to be at issue before they could refile their summary judgment motions. This level of inconvenience, however, is insignificant. The Court has no knowledge of the extent of discovery conducted to date, but it appears from the summary judgment motions that they have conducted three or four depositions and engaged in some written discov-

ery. The Court does not know of any reason why they could not use this discovery in a new case to avoid duplication of effort and cost.

In terms of prejudice, the Court has considered whether a state statute of limitation would prevent the refiling of these claims. Fortunately, the Colorado legislature has had the foresight to anticipate this problem. Section 13–80–111 of the Colorado Revised Statutes, titled "Commencement of new action upon involuntary dismissal," provides that:

(1) If an action is commenced within the period allowed by this article and is terminated because of lack of jurisdiction or improper venue, the plaintiff or, if he dies and the cause of action survives, the personal representative may commence a new action upon the same cause of action within ninety days after the termination of the original action or within the period otherwise allowed by this article, whichever is later, and the defendant may interpose any defense, counterclaim, or setoff which might have been interposed in the original action.
(2) This section shall be applicable to all actions which are first commenced in a federal court as well as those first commenced in the courts of Colorado or of any other state.

Colo. Rev. Stat. § 13–80–111(1)–(2). Thus, the Debtor would have at least ninety days from the date of dismissal in which to refile claims before any jeopardy would attach.

In this particular case, the Court weighs most heavily the principles of judicial comity. It strikes this Court as unwise to have a bankruptcy court determining an issue of unsettled Colorado law that goes to such a basic issue as the intersection between Colorado contract, tort, and statutory law. Moreover, principles of comity make this Court lean toward leaving state law con-

tract claims with the state courts, as that is part of their bread and butter. This Court's bread and butter is adjudicating questions of bankruptcy law. The one fact that has given this Court pause is the length of time that this case has been pending, but if this Court were to retain jurisdiction over this action, it would most likely hold the summary judgment motions, or at least one aspect of them, in abeyance until the Colorado Supreme Court has ruled on the interplay between the economic loss rule and Colorado's Civil Theft Statute. Thus, the parties would not likely realize a more speedy resolution of their claims in front of this Court. Given the lack of prejudice, minor inconvenience, and lack of substantive role that this Court has played in this case to date, the other factors do not outweigh this Court's concern over judicial comity.

Finally, the Court is concerned that, if the parties continued the litigation in this forum, whether through summary judgment, a trial, or a combination of both, there is a significant possibility that an appellate court might later determine this Court lacked subject matter jurisdiction. Then, after considerably more time and expense on appeal, the parties would have to begin anew in state court. This would be the worst possible outcome the Debtor and BCG could face. It is better to avoid this risk by proceeding in a forum where the court's authority to determine the case is not subject to any doubt. For all of these reasons, the Court exercises its discretion in favor of dismissal.

## III. CONCLUSION

Based on the foregoing, the Court hereby ORDERS that this adversary proceeding is DISMISSED, without prejudice.